[Cite as *Pool v. Dad's Place*, 2025-Ohio-5262.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

Fire Chief Douglas Pool, City
of Bryan Fire Department

      Appellees

v.

Dad's Place of Bryan, Ohio, et al.

      Appellants

Court of Appeals No. WM-24-020

Trial Court No. 24 CI 000100

**<u>DECISION AND JUDGMENT</u>**

Decided: November 21, 2025

* * * * *

Marc A. Fishel and Benjamin D. Humphrey, for appellee.

Philip D. Williamson, Jeremiah G. Dys, Ryan N. Gardner, Bradley G. Hubbard,
Prerak Shah, Benjamin D. Wilson, and Stephen D. Hartman, for appellant..

Yazan S. Ashrawi, of The Ohio Municipal League, amicus curiae.

Dave Yost, Ohio Attorney General, T. Elliot Gaiser Solicitor General, Katie Rose
Talley, and Jana M. Bosch Deputy Solicitors General, amicus curiae.

* * * * *

**ZMUDA, J.**

{¶ 1} Appellant, Dad's Place of Bryan, Ohio, appeals the December 5, 2024 judgment of the Williams County Court of Common Pleas granting the motion of appellee, Fire Chief Douglas Pool, for a preliminary injunction. For the reasons that follow, we reverse the trial court's judgment and remand the matter for further proceedings.

### I. Facts and Procedural History

{¶ 2} Appellant is a church located in Bryan, Ohio. Between November 2023 and April 2024, appellee, chief of Bryan's fire department, conducted several inspections of appellant's premises and reported several violations of Bryan's fire code. Most of the violations were resolved, but in April 2024, appellee issued citations for two unresolved violations: a change in use occupancy from assembly to residential and the lack of an automatic sprinkler system. Neither citation was administratively appealed.

{¶ 3} A few months later, on July 26, 2024, appellee filed a complaint pursuant to R.C. 3737.45 and Bryan Codified Ordinance section 1501.05(d)[1] in Williams County Court of Common Pleas against appellant. R.C. 3737.45 provides as follows:

> If any responsible person fails to comply with an order of the fire marshal … as finally affirmed … by the state board of building appeals … then the fire marshal … may file a complaint in the court of common pleas of the

---

[1] Bryan Codified Ordinance 1501.05(d), unlike R.C. 3737.45, does not permit the fire marshal to file a civil complaint against a responsible party, but rather provides that a fire official may request that "the City Attorney of the jurisdiction to institute the appropriate legal proceedings to restrain, correct or abate [a fire code violation] or to require removal or termination of the unlawful use of the building or structure."

2.

county where the property is located for a court order authorizing the fire marshal… to cause the building, structure, or premises to be repaired or demolished, materials to be removed, and all dangerous conditions to be remedied, if such was the mandate of the order as affirmed or modified by the state board of building appeals, at the expense of the responsible person.

Appellee sought an order "to cause materials to be removed, and all dangerous conditions to be remedied, including, but not limited to an order requiring [appellant] to immediately cease and desist from using [the premises] as a residential use occupancy in violation of the Ohio Fire Code and Bryan Codified Ordinances."

{¶ 4} On the same day, appellee filed a motion for a preliminary injunction and temporary restraining order pursuant to R.C. 3737.44, which grants jurisdiction to a common pleas court to enjoin "any condition or practices in any building or upon any premises which violate the state fire code and are such that a fire … hazard exists which could reasonably expected to cause death or serious physical harm," and R.C. 3737.46, which permits a legal officer of a municipal corporation to bring an action for an injunction "against any person violating … any provision of the state fire code" upon the fire marshal's request. Appellant opposed appellee's motion, arguing that the enforcement of the fire code in this case would unconstitutionally burden its religious exercise under both the U.S. Constitution and the Ohio Constitution.

{¶ 5} The trial court held a hearing on appellee's motion for a preliminary injunction and temporary restraining order on September 20, 2024. The following summary of the background facts primarily stems from the evidence submitted for the

3.

hearing, including the testimony and affidavit of appellant's pastor, Christopher Avell, appellee's testimony, and portions of deposition transcripts filed with the trial court.

### *The Church*

{¶ 6} Appellant, a non-denominational Christian church, was founded by Pastor Christopher Avell in 2018. In 2019, appellant moved to its current location, the first floors of 216 and 226 South Main Street, which is in the downtown area of Bryan, Ohio. Both addresses are located in one building, and appellant leases its premises from Riehle Rentals, LLC[2] under an oral month-to-month tenancy. As of the filing of the instant litigation, the use occupancy for the first floor of 226 South Main Street, the portion of the building that appellant uses as its sanctuary, is assembly, and the use occupancy for 216 South Main Street, is mercantile. Only one portion of the building, 226 South Main Street, has a second floor. The second floor consists of two apartments, which are also owned by Riehle Rentals, LLC, and both have a residential use occupancy. One apartment is rented by an unrelated tenant, and an onsite caretaker for the church resides in the second apartment.

{¶ 7} Avell has felt religiously called to serve the homeless and needy in Williams County. Beginning sometime in 2018, which Avell claims was often at the request of Bryan police officers, appellant intermittently permitted individuals who had nowhere else to go to temporarily stay at the church overnight. In March 2023, appellant officially

---

[2] Riehle Rentals, LLC was named as a defendant in this action, but it has not participated in this appeal.

opened its doors to the public 24 hours a day, seven days a week. From 11:00 p.m. to 8:00 a.m. each night, appellant operates a ministry it calls "Rest and Refresh in the Lord" in the building's first floor, during which anyone in need—homeless or not—is welcome inside. Pastor Avell testified that providing shelter to those in need is part of his sincerely held religious beliefs, and he has cited several portions of the Bible to support his beliefs. Pastor Avell also maintains that appellant's current location in downtown Bryan is central to its ministries because of its close proximity to many essential resources for its congregants.

{¶ 8} The church does not limit the number of individuals who enter the building each night. Individuals are permitted to enter the church with one bag of items, which may contain "comfort" items such as a blanket or pillow. Appellant's policy is that no one is asked to leave unless there is a "biblical" reason to do so, which Pastor Avell testified would be "if they were a danger to someone, [or] if they had continued non-repented sin." According to Avell's religious beliefs, making someone leave without a "biblical reason" would be a sin.

{¶ 9} Avell clarified that appellant "does not feel called to operate a homeless shelter or to simply provide housing," but instead, citing Bible scriptures in support, appellant "feels called by God to offer a safe, loving place where it can welcome in the 'stranger,' to 'live among' the Church as that person rests, recovers, and hopefully comes to know Jesus." Audio recordings of scripture readings play throughout the night, and those who participate in the ministry are encouraged to pray and engage in fellowship.

5.

### *The Initial Fire Inspections*

{¶ 10} Appellee conducted several inspections of appellant's premises beginning in November 2023 and continuing through spring 2024, generating an inspection report for each inspection. A number of fire code violations were noted initially, though these violations were resolved prior to the instant litigation and none of them relate to the violations currently at issue.

{¶ 11} On January 16, 2024, appellee concluded that appellant had impermissibly changed the use or occupancy of the premises, as stated in his inspection report:

> A sleeping area was created in the front section of the building. Cots were in use. Cots were noted on site during inspection 1/5/24 and 1/9/24. Inspectors were told items were being temporarily stored in the front of the building and not in use. Sleeping areas are considered residential use by Fire Code. The Assembly Use Group does not include sleeping areas. A Certificate of Occupancy approved by the State of Ohio is required for any use other than Assembly. Discontinue use of sleeping areas without approval.

{¶ 12} Notably, Ohio's fire code imposes safety requirements that vary depending on the use occupancy of each building. Use occupancies are defined in the Ohio building code, and those definitions are incorporated into the fire code. Use occupancies are categorized into different groups, such as residential (group R) and assembly (group A), as well as different divisions within the groups, such as R-1, R-2, R-3, and R-4. A building's use occupancy is determined by the State of Ohio Board of Building Standards, which issues a certificate of occupancy for each building or a portion of a building.

6.

{¶ 13} The fire code generally prohibits a building's occupant from changing the use occupancy of the building unless the occupant complies with the fire code provisions governing the new use occupancy, and the fire code provides that appellee can issue a citation for an impermissible change of use. Notably, the fire code provides that the state fire marshal has sole discretion to issue variances from the fire code requirements, though the fire marshal may only grant a variance if the variance does not present additional risk to public safety.

{¶ 14} Appellee testified that he also has the discretion to permit a change of use occupancy if he determines that the new use occupancy presents a lesser hazard than the previously approved use occupancy. He also testified that he has "some discretion" in determining when a change of use has occurred, and the Ohio General Assembly is considering "new legislation [that] will reduce that discretion." Appellee testified that appellant's change of use from assembly, which involves gatherings of many people, to residential, which involves sleeping individuals, would present a greater hazard because sleeping individuals are less likely to be aware of a fire.

{¶ 15} Appellee later explained that by adding a "sleeping area" to the premises, appellant impermissibly changed its use occupancy to residential, testifying in a deposition regarding his definition of a sleeping area as follows:

Q. Sleeping, is it an issue for people to sleep during the day?

A. Sleeping is specifically designed – sleeping is specifically defined for the sleeping areas that are created by putting cots using bedding material. Those are specifically defined in the fire code. Someone sitting in a chair

that is sleeping does not necessarily implicate that sleeping is occurring. A sleeping area has been established.

Q. Okay. So, your concern is over a sleeping area, not necessarily people who are in sleep?

A. Correct.

….

Q. So, had you walked in at 5:30 in the morning and people were sitting in a chair with their head down on the table, that's not a sleeping area?

A. That is correct.

Q. Had they been sitting upright in a chair in the corner, that's not a sleeping area?

A. I would not have considered that a sleeping area.

Q. Sitting on the ground, leaning against the wall, not a sleeping area?

A. I do not see that as a sleeping – I do not interpret that as a sleeping area.

Q. I understand. I'm just trying to understand the parameters of a sleeping area. I'm not – I've not read all the mechanical code either.

A. As the fire code is defining it, and this is a generality because I don't have the specific, it's essentially using bedding materials, cots, pillows, or arranging furniture to create bedding areas.

Q. Okay. So, let me go back through some of my list here. If they were sitting on a chair, head on the table, but the head is supported by a pillow, that's a sleeping area?

A. That's subject to interpretation. My personal belief is that individual sitting in a chair, leaning forward, whether it's on a pillow or anything else, is not a sleeping area. That's my interpretation.

Q. Could they sit on a La-Z-Boy?

A. There becomes a – an interpretation, are they using it as bedding or [did] they simply [fall] asleep in the chair.

….

Q. So, Dad's Place could have complied with your risk assessment by just simply not having a sleeping area?

A. That's correct.

### *The Federal Litigation and the Citations*

{¶ 16} On January 22, 2024, appellant filed suit in federal court against appellee and the city of Bryan, alleging that the enforcement of the fire and zoning codes[3] would violate appellant's religious freedoms under the U.S. Constitution and the Ohio Constitution, as well as violate other federal laws. Appellant contended that its practice of allowing individuals to stay overnight in its premises was part of its sincerely held religious beliefs. Accordingly, appellant sought a preliminary injunction against the enforcement of the codes to the extent that they would require appellant to cease this practice.

{¶ 17} In February 2024, appellant and appellee met in an attempt to resolve the federal litigation. As a result of that meeting, appellant removed the cots from the building and engaged a live-in caretaker to remain in the building at all times, leasing an apartment for the caretaker's use on the building's second floor that had just become

---

[3] Although the federal court litigation involved Bryan's zoning code, the instant litigation is limited to the enforcement of the Ohio fire code.

9.

available.  In exchange, appellee issued an inspection report indicating that the fire code violations were resolved.

{¶ 18} After finding individuals sleeping in appellant's sanctuary—though on the floor or on plastic chairs rather than in cots—during inspections in April 2024, appellee issued two citations[4] and a notice of proposed penalty to Avell and Riehel Rentals, Inc. Appellee later testified that he had not issued any citations before then because "[i]t's not typical for us to initially cite.  We try to resolve."  He issued citations on April 24, 2024, because "[w]e ha[d] not made any progress on resolving the un-resolved issue of change of use, of people sleeping in the building."

{¶ 19} Appellant is not named on the citations and notice of proposed penalty. The citations both state that the fire code was violated due to an impermissible change in the use or occupancy of the premises as well as the lack of an automatic sprinkler system. They specifically state that the premises has a group A (assembly) occupancy permit, but they are being used as a group R (residential) congregate living facility due to "transient occupants arranging the furniture to sleep."  In addition, the citations state that an automatic sprinkler system is required for a residential congregate living facility.  There was no evidence before the trial court that anyone—the landlord, Avell, or appellant— pursued an administrative appeal of the citations or penalty.

---

[4] One citation, along with the notice of proposed penalty, was issued pursuant to the Ohio Administrative Code and Ohio Revised Code.  The second citation is a City of Bryan Fire Department Citation issued pursuant to Bryan's Codified Ordinances.  Both are dated April 24, 2024, and were issued for identical reasons.

10.

{¶ 20} Appellee testified that appellant's attempt to comply with the code by removing the cots from the building's first floor was insufficient, explaining that "[t]he definition for sleeping does not rely upon where specifically they're sleeping. It does look at some issues of using bedding material, furniture but it does not say that you can sleep on the floor either." Appellee also testified that the use of furniture or bedding materials was not a factor for his own understanding of the definition of sleeping, testifying about a photograph taken during an inspection in April 2024 of a person lying on the floor of appellant's sanctuary as follows:

> Q. Okay and again I noticed that, I note that the person sleeping again toward the middle of that picture doesn't appear to have any blankets or pillows. Does that change your analysis at all?
>
> A. It did not change my understanding of the requirement for sleeping.

{¶ 21} Appellee also testified that determining the appropriate use occupancy for appellant was not clear cut. Although he was certain that appellant's use was residential, he could not say for sure which specific division of the residential group occupancy applied to appellant's use, testifying that "[t]he specific sub-division is difficult to determine but we are definitely in a Group R." Appellee explained that "any sleeping area is by [fire] code definition either a residential use or an institutional use."

{¶ 22} Appellee also explained that the apartments on the second floor of the premises do not need a sprinkler system despite their residential use occupancy due to grandfathering. Likewise, appellee testified that several area motels, shelters, and congregate living facilities were not required to have automatic sprinkler systems due to

grandfathering. Appellee explained that the code permits grandfathering because modifying structures to comply with new fire safety laws is a significant cost for businesses, and allowing existing uses to continue without new safety measures creates no greater hazard than already existed before the new laws were enacted.

{¶ 23} In spring 2024, appellant attempted to apply to the Ohio Board of Building Standards for a certificate of use and occupancy from the state to resolve the fire code violation, but the application was denied. The reason for the denial is not in the record. Around the time appellant attempted to change the premises' use occupancy, appellee notified Avell that appellant would be required to install an automatic sprinkler system to change the use occupancy to residential. Avell testified that not only would installing a sprinkler system require appellant to shut down its ministry for possibly several months due to the significant construction required, but installing a sprinkler system was well outside appellant's financial means. Accordingly, appellant did not further pursue a change of its use occupancy.

{¶ 24} In July 2024, the U.S. District Court for the Northern District of Ohio issued a decision denying appellant's motion for a preliminary injunction. *Dad's Place of Bryan, Ohio v. City of Bryan*, N.D.Ohio no. 3:24-cv-00122-JZ (July 19, 2024). As to appellant's claim under the U.S. Constitution's Free Exercise Clause, the district court determined that appellant failed to establish that enforcement of the fire code would burden appellant's religious exercise, explaining that appellant had failed to provide any evidence that the installation of a sprinkler system would impose any burden. *Id*. The

12.

court also determined that the fire code was neutral and generally applicable and thus subject to rational basis review and not strict scrutiny. *Id.* Although appellant argued that the fire code was not generally applicable because it gave appellee significant discretion in applying the fire code, the court concluded that the code was generally applicable because appellee's discretion was part of the regular scope of his duties, citations could be appealed administratively, and the automatic sprinkler system requirement that applies to groups R-1 and R-3 was not subject to any exceptions. *Id.* Applying a rational basis review, the court determined that the city's interest in maintaining public safety was a compelling interest, and the fire code was the least restrictive means in achieving that interest. *Id.* The court, therefore, concluded that appellant was not likely to succeed on the merits of its federal free exercise claim. *Id.* The district court did not address the merits of appellant's Ohio constitutional claim. *Id.*

{¶ 25} Appellant appealed, and the U.S. Court of Appeals for the Sixth Circuit affirmed the trial court's judgment in a decision issued on September 5, 2024. *Bryan v. City of Bryan*, 2024 U.S. App. LEXIS 22738. As to appellant's federal free exercise claim, the Sixth Circuit held that appellant was unlikely to succeed on the merits because appellant had not demonstrated that the fire and housing codes at issue imposed a burden on appellant's exercise of its religion, explaining as follows:

> As for the zoning ordinances, Dad's Place has not, for example, demonstrated that it cannot use a second floor to operate its religious ministry. *See Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 731-33 (6th Cir. 2021) (per curiam). And as for the fire code, Dad's Place has not explained why installing a sprinkler system would prevent it from

exercising its religion. *See id*. The district court ably put it this way: "Dad's Place does not identify the burdens [or costs] . . . of being required to install [a sprinkler system]." R.47, PageID 1396. To the extent Dad's Place suggests the City has targeted it based on religious status by enforcing the fire code in discriminatory ways, Dad's Place has failed to show "elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated" its operation of a homeless shelter. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 634 (2018).

*Id*. at *8.

{¶ 26} Notably, the Sixth Circuit expressly declined to address the merits of appellant's arguments under the Ohio Constitution. *Id*. at *7. The court reasoned that appellant failed to adequately argue the issue before the trial court, stating as follows:

Dad's Place argues that the district court's failure to address its claim under the Ohio constitution's free exercise clause itself merits an injunction. The City disagrees, arguing that Dad's Place made only cursory mentions of its Ohio constitution claim in its filings below. Dad's Place asserts that it referenced the claim in multiple briefs. A review of the filings demonstrates that these references were merely cursory mentions of the issue, not developed arguments. And although Dad's Place argues that the issue was discussed extensively at a preliminary injunction hearing, it has not provided us with a transcript of that hearing. Because it appears from the available record that Dad's Place is inappropriately using this court as one of first view, its Ohio constitution claim fails.

*Id*., citing *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365 (6th Cir. 2022), quoting *McLane Co. v. EEOC*, 581 U.S. 72, 85 (2017).

*Appellant's Future Options for Its Ministry*

{¶ 27} At the preliminary injunction hearing in September 2024, appellee testified that appellant had four options to operate its overnight ministry: (1) retain a professional to assist with an application for a variance from the state fire marshal; (2) retain a

14.

professional to install a sprinkler system and then file a change of use occupancy, which Avell testified appellant could not afford to do; (3) move its overnight ministry elsewhere, which Avell testified appellant also could not afford to do; or (4) prevent individuals from sleeping during its overnight ministry.[5] These options were complicated by appellant's mixed use of the premises—appellee testified that appellant was using its premises as both assembly and residential.

{¶ 28} Appellee testified that he was not aware of any properties in the city of Bryan that had use occupancies for assembly-residential mixed use.

> Q. Are there any other mixed use, A-R mixed use properties in the City of Bryan?
>
> A. There are none that I'm aware of.
>
> Q. In fact, there are currently not any mixed A-R use properties in Bryan, Pulaski Township, half of Center Township, and a portion of Jefferson Township, correct?
>
> A. None that I'm aware of.
>
> Q. So I guess it would mean that in a seventy-two mile[] square mile radius around Bryan, Dad's Place has nowhere to go to conduct its sincere religious exercise, correct?

---

[5] The conditional use permit referred to at times throughout the litigation before the federal courts and in the instant litigation appears to stem from zoning ordinances enacted by the city of Bryan. Those ordinances allow property occupants to use the property in a manner other than the property's zoned use as established by the city of Bryan by obtaining a conditional use permit from the city of Bryan. Although Bryan's zoning ordinances incorporate Ohio building code's use occupancies, the Ohio Board of Building Standards generally determines use occupancies for purposes of the Ohio fire code, not the city of Bryan. Accordingly, it does not appear from the record before us that appellant could change its use occupancy under the Ohio fire code by obtaining a conditional use permit from the city of Bryan.

15.

A.  Not in the manner that they're trying to conduct in the building that they're in at this time, no.

{¶ 29} Moreover, appellee testified that although the fire code does not require certain buildings in the R-2 division to have automatic sprinkler systems, appellant did not qualify for that exception because of appellee's mixed use of the premises.  Appellee explained at the hearing that although he had just weeks before testified at a deposition that appellant may qualify for that exception, he had done additional research in the intervening weeks.  According to his new research, appellee believed that there must be a fire wall separating spaces with different uses for that exception to apply, making a mixed-use occupancy ineligible for the exception, and he was not certain what the Ohio Board of Building Standards would say.  When asked how appellant could determine how to comply with the fire code if appellee was also unsure, appellee explained that was why appellant needed to hire an engineer.

### The Trial Court's Order

{¶ 30} In an order issued on December 5, 2024, the trial court granted appellee's motion for a preliminary injunction.  The court's order included several findings of fact, including that "Dad's Place currently has no right to use or operate on the second floor and pays no rent for the use of the second floor."  However, the court also found that "[f]or a brief period of time, Riehle Rentals, LLC allowed Dad's Place to use a second floor apartment for citizens visiting Dad's Place.  No explanation was presented to the Court at the hearing regarding potential on-going use of the second floor apartments by

16.

Dad's Place." Moreover, the court found that "Dad's Place and Christopher Avell have not yet pursued the rights to lease the second floor of their church location from Riehle Rentals, LLC. No explanation was given to the Court."

{¶ 31} In its analysis, the trial court determined that a rational basis test applied to appellant's constitutional arguments, stating that "[u]nder the governing standard, a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." (Emphasis omitted.) In support, the trial court cited two federal cases applying federal constitutional law, *Employment Division, Dept of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990) and *Stormans, Inc. v. Selecky*, 586 F. 3d 1109 (9th Cir. 2009). After applying a rational basis review, the trial court concluded that enforcement of the fire code did not violate appellant's constitutional rights. The court explained that appellant had alternatives to operate the ministry that would not involve violating the fire code, including seeking a conditional use variance from the city of Bryan, pursuing a lease for the building's second floor for the portion of appellant's ministry that involves a residential use, and operating a separate facility where residential use is permitted.

{¶ 32} The trial court did not address appellant's arguments under the Ohio Constitution other than to note in its recitation of the case's background that "the Sixth Circuit Court of Appeals ruled that [appellant] would not likely succeed on the merits of its free exercise claims under the U.S. and Ohio Constitutions." The trial court likewise

17.

did not cite the Ohio Constitution or any case law applying Ohio constitutional law on the exercise of religion.

**{¶ 33}** The next day, Dad's Place filed a notice of appeal in this court. Appellant also filed a motion to stay the trial court's order pending appeal in this court, which we granted. Both parties submitted briefs on the merits of the appeal.

## II. Assignment of Error

Appellant asserts a single assignment of error for our review:

> The trial court erred when it issued a preliminary injunction barring Dad's Place from operating its 24/7 ministry.

## III. Law and Analysis

**{¶ 34}** In support of its assignment of error, appellant makes several arguments, primarily taking issue with the trial court's determination that appellee was likely to succeed on the merits based on the trial court's application of a rational basis test in considering appellant's constitutional arguments. Appellant argues that under both Ohio and federal constitutional law, the trial court should have reviewed the law under a strict scrutiny test, not rational basis, and under the strict scrutiny test, the enforcement of the fire code is unconstitutional and therefore appellee was not likely to succeed on the merits. Appellant contends that the trial court's order would force appellant to close its doors to individuals in need and therefore would prevent appellant from exercising its religious rights.

18.

{¶ 35} Appellant's assignment of error requires our analysis under both Ohio constitutional law and federal constitutional law. As we will discuss more fully below, Ohio constitutional law and federal constitutional law governing the exercise of religion are not identical. Accordingly, we will address the assignment of error in two parts, beginning with federal constitutional law.

### A. Standard of Review

{¶ 36} We review a trial court's order issuing an injunction for an abuse of discretion. *Garono v. State*, 37 Ohio St.3d 171, 173 (1988). However, "we review legal determinations de novo, including the likelihood of success on the merits." *Cincinnati v. State*, 2024-Ohio-2425, ¶ 24 (1st Dist.), quoting *City of Columbus v. State*, 2023-Ohio-2858, ¶ 27 (10th Dist.). Indeed, "[n]o court—not a trial court, not an appellate court, nor even a supreme court—has the authority, within its discretion, to commit an error of law." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38, quoting *State v. Boles*, 2010-Ohio-278, ¶ 26 (2nd Dist.). Because the constitutionality of a statute or regulation is an issue of law, we review de novo the trial court's determination that the enforcement of the fire code against appellant is constitutional. *See State /Village of Put-in-Bay v. Mathys,* 2019-Ohio-162, ¶ 8 (6th Dist.), quoting *State v. Whites Landing Fisheries, LLC*, 2017-Ohio-4021, ¶ 15 (6th Dist.) ("The constitutionality of a statute or regulation is a question of law to be reviewed de novo.").

**B. Strict scrutiny applies to appellant's federal free exercise claim.**

{¶ 37} "The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law ... prohibiting the free exercise' of religion." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 532 (2021).  A party challenging a law under the Free Exercise Clause must first establish that the law imposes a burden on the party's exercise of religion.  *See Mahmoud v. Taylor*, 145 S.Ct. 2332, 2360 (2025).  If the law imposes such a burden, then the court must determine whether the burden imposed by the law is constitutional.  *Id.*  If the law is neutral and generally applicable, then a court applies a rational basis review to determine whether the burden is constitutional, considering whether the law is rationally related to a legitimate government interest.  *See Pleasant-Bey v. Shelby Cnty., TN*, 2021 WL 11097076, *3 (6th Cir. Aug. 20, 2021), citing *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990).  If, however, the law is either not neutral or not generally applicable, then the law is subject to strict scrutiny review, which means that to be constitutional, the law must be narrowly tailored to serve a compelling governmental interest.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

{¶ 38} Here, both a federal district court and a federal appellate court have considered whether the enforcement of the fire code against appellant is constitutional, and both have concluded that it is.  However, we note that appellee does not assert that the federal decisions have a res judicata effect, nor could appellee successfully make such

20.

an argument because a decision denying a preliminary injunction is not a final decision on the merits and therefore has no preclusive effect. *See R.L.R. Investments LLC v. Cross St. Partners LLC*, 2024-Ohio-2292, ¶ 18 (2nd Dist.).

{¶ 39} Moreover, the record in the instant case contains additional facts not contained in the record before the federal courts. Both federal courts noted in their opinions that appellant had failed to provide any reason to explain why installing a sprinkler system would impose a burden on its religious exercise. In the hearing before the trial court in this case, however, Avell offered unrefuted testimony that installing a sprinkler system was well outside appellant's financial means and would require appellant to close down its ministries for a significant period of time.

{¶ 40} The federal courts also pointed to the lack of evidence in the record before them regarding appellant's ability to move its ministry to a second-floor location.[6] Here, however, Avell testified regarding the unavailability of the two apartments on the building's second floor and the trial court specifically found that appellant had no right to use the second floor. In addition, the record in this case contains more information regarding the assembly-residential mixed-use occupancy for appellant's ministry that

---

[6] The litigation in the federal courts also involved the constitutionality of the city of Bryan's zoning laws, which prohibit residential use on buildings' first floors in downtown Bryan. The enforcement of Bryan's zoning laws is not an issue in this litigation, which only involves the constitutionality of the state fire code. Accordingly, that aspect of the federal courts' decisions is not relevant to our analysis.

21.

would prevent appellant from moving the assembly portion of its overnight ministry to the second floor, which only has an existing use occupancy of residential.

{¶ 41} Because the record before us contains significant additional material facts regarding the burden imposed by the sprinkler system and the unavailability of the second floor as a viable alternative to conducting appellant's ministry on the first floor, the trial court's reliance on the federal courts' decisions was in error. Accordingly, we must consider whether, on the facts contained in the record before us, the trial court applied the appropriate level of review to appellant's free exercise claim under the U.S. Constitution.

### 1. Enforcement of the fire code imposes a burden on appellant's religious exercise.

{¶ 42} "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981). Indeed, when a party claims that an action demanded by the government would fall on the "forbidden side of the line [of its religious beliefs,] it is not for us to say that their religious beliefs are mistaken or insubstantial. Instead, our 'narrow function ... in this context is to determine' whether the line drawn reflects 'an honest conviction.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014), quoting *Thomas* at 716. Accordingly, courts may not inquire whether a party's professed means to exercise its beliefs is the most logical or sensible way to do so. *See Fulton,,* 593 U.S. at 532–33 (2021).

22.

**{¶ 43}** Here, appellant maintains that its nighttime ministry is not intended to be a homeless shelter, but instead part of its religious duty to "offer a safe, loving place where it can welcome in the 'stranger," to 'live among' the Church as that person rests, recovers, and hopefully comes to know Jesus," quoting the Bible in support for its beliefs. Appellant also maintains that its religious beliefs require it to operate its ministry in its current location because that location best meets the needs of those it serves. Finally, appellant maintains that prohibiting individuals from sleeping in its sanctuary would violate its beliefs. Appellee does not dispute the sincerity of appellant's beliefs, and it is not for this court to say that appellant is somehow mistaken in its interpretation of its religious obligations or that its religious beliefs are illogical. *See Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 Fed.Appx. 726, 729 (9th Cir. 2016) (explaining that the trial court "erred by questioning the validity of the [c]hurch's religious beliefs and by determining that its homeless ministry could be divided piecemeal when the [c]hurch insisted on the importance of keeping its homeless ministry as a whole at the same location."). Therefore, we must accept appellant's assertions regarding its religious beliefs.

**{¶ 44}** Next, we must consider whether appellant's religious exercise is burdened by the enforcement of the fire code. A burden exists when the government imposes "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 450–51 (2017), quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439,

23.

450 (1988). A burden on religious exercise may include the imposition of a significant financial cost to exercise a religious belief. *See Burwell*, 573 U.S. at 726.

{¶ 45} Here, unlike in the federal litigation, appellant has presented undisputed evidence that it does not have the financial means to install a sprinkler system. Appellant has also presented evidence that the installation of a sprinkler system would require appellant to cease its religious exercise for a significant period of time. Next, not only has appellant presented undisputed evidence that it cannot afford to open a second location to provide sleeping accommodations, appellant maintains that its religious beliefs require it to welcome the stranger to live among the church, not to operate an off-site homeless shelter. Moreover, appellant cannot simply relocate to somewhere else in the surrounding area with the appropriate use occupancy. Because appellant's ministry involves gatherings for religious worship, during which individuals are permitted to fall asleep, appellee maintains that appellant's use occupancy is mixed, involving both assembly and residential use, and no location in the surrounding area—including the building's two second-floor apartments—has a use occupancy for both assembly and residential. Finally, even if appellant's ministry merely involved providing a place to sleep and nothing more, appellant cannot send individuals upstairs to sleep because those apartments are already occupied. Outside of a fire official exercising discretion in favor of appellant, appellant is left with only one option to comply with the fire code: cease permitting individuals to sleep in its premises, which would violate appellant's religious beliefs. Accordingly, appellant has established that its religious beliefs would be

24.

burdened by the enforcement of the fire code. *See Fulton*, 593 U.S. at 532 (explaining that a party's religious beliefs were burdened where the party either had to comply with a government requirement that violated the party's religious beliefs or seek a discretionary exemption from a government official).

**2. The fire code at issue is not generally applicable.**

{¶ 46} Even if the enforcement of the fire code imposes a burden on appellant's religious exercise, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990), quoting *United States v. Lee*, 455 U.S. 252, 263, n. 3, (1982) (Stevens, J., concurring in judgment). However, if the law is either not neutral or not generally applicable, the law is subject to strict scrutiny, and thus it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of Lukumi Babalu Aye, Inc.,*, 508 U.S. at 531-32. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism' for individualized exemptions." *Fulton*, 593 U.S. at 533 (2021), quoting *Smith*, 494 U.S. at 884, quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986). For example, in *Fulton*, a city contract permitted a city commissioner, in the commissioner's sole discretion, to grant exemptions from complying with a non-discrimination clause in the contract. *Id*. According to the Ninth Circuit, "the mere

25.

existence of government discretion is enough to render a policy not generally applicable." *Fellowship of Christian Athletes v. San Jose Unified School Dist. Bd. of Education*, 82 F.4th 664, 685 (9th Cir. 2023).

{¶ 47} Not all federal courts have made such broad statements, and some have determined that a mechanism for exemptions involving the exercise of some discretion does not trigger strict scrutiny if the government must apply objective criteria and exercise professional judgment in determining if the exemption applies. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 289-90 (2d Cir. 2021), citing *Smith*, 494 U.S. 872 (noting that *Smith* held that a law that prohibited the use of a controlled substance unless prescribed by a medical provider was generally applicable); *Miller v. McDonald*, 130 F.4th 258, 269 (2d Cir. 2025). In those cases, which involve medical exemptions to laws imposing vaccine requirements, the courts held that because the government does "not have 'discretion to approve or deny exemptions on a case-by-case basis' for any reason," but instead must consider objective criteria to grant the exemption, the law is generally applicable. *Miller* at 269. Such exemptions do not invite the government to consider the reasons for a person's conduct and do not involve the exercise of unfettered discretion like the exemption in *Fulton*. *Id*.

{¶ 48} Here, appellant argues that the fire code is not generally applicable because it allows the government to exercise significant discretion in the enforcement of the code. Appellant argues that appellee has the discretion to determine when a change of use occurs, when a sleeping area exists, and when to impose a citation, and appellant also

26.

points out that the fire code permits the state fire marshal to grant a variance for any of the fire code requirements.

{¶ 49} Appellant is correct that appellee has significant discretion to determine whether a building's occupant impermissibly changed its use occupancy. The fire code generally prohibits a building's occupant to change the building's use occupancy as follows:

> Changes shall not be made in the use or occupancy of any structure that would place the structure in a different division of the same group or occupancy or in a different group of occupancies, unless such structure is made to comply with the requirements of this code and the building code as listed in rule 1301:7-7-80 of the Administrative Code. Subject to the approval of the fire code official, the use or occupancy of an existing structure shall be allowed to be changed and the structure is allowed to be occupied for purposes in other groups without conforming to all the requirements of this code and the building code as listed in rule 1301:7-7-80 of the Administrative Code for those groups, provided the new or proposed use is less hazardous, based on life and fire risk, than the existing use.

Admin.Code 1301:7-7-01. Because the fire code grants appellee the discretion to determine when a change of use has occurred and to permit a change of use occupancy in certain circumstances, the fire code permits individualized exemptions at appellee's discretion. Although appellee's discretion under this exemption does have some constraints—to permit the change of use without requiring an occupant to comply with the fire code sections applicable to the new use, appellee must determine that the new use presents a lesser hazard than the previous use—a close review of the record reveals that

27.

appellee did not use his professional judgment to interpret *objective criteria* in determining that appellee impermissibly changed its use.

{¶ 50} According to appellee's testimony, his conclusion that appellant changed its use from assembly to one involving a greater hazard, residential—or as he later concluded, mixed assembly-residential—was based on appellant's addition of a sleeping area to the premises. Appellee repeatedly claimed that in determining that appellant had created a sleeping area, he relied on criteria contained in the fire code regarding furniture and bedding materials, though he could not identify in his testimony any specific fire code sections as his source, nor did he do so in his fire inspection reports.

{¶ 51} The fire code provides in its initial introduction of the residential group that "Residential Group R includes, among others, the use of a building or structure, or a portion thereof, for sleeping purposes." Other portions of the code governing the residential group use the term "sleeping area" at times, though not to define what constitutes a residential use. However, neither "sleeping area" nor "sleeping" is defined in the fire code. Admin.Code 1301:7-7-02.[7] The fire code does define similar terms,

---

[7] Instead, the fire code provides that "[w]here terms are not defined through the methods authorized by this paragraph, such terms shall have ordinarily accepted meanings such as the context implies," and "'Merriam Webster's Collegiate Dictionary, 11th Edition' shall be considered as providing ordinarily accepted meanings." *Id*. According to that dictionary, "sleep" is the "natural periodic suspension of consciousness during which the powers of the body are restored." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003.)

28.

such as "sleeping units," "sleeping rooms," and "dwelling units,"[8] which do contain some references to furniture or provisions for sleeping in their definitions, but appellee did not allege that one of those terms applied to appellant's use, consistently maintaining instead that appellant had created a "sleeping area." Admin.Code 1301:7-7-02. Accordingly, either appellee repeatedly used the incorrect term from the fire code throughout his inspection reports, citations, and testimony in both the federal litigation and in the instant litigation to describe appellee's use of the premises or appellee created his own criteria not contained in the fire code to the definition of that term. Notably, while appellee claimed to have used the fire code to make his determination, he also used his own "personal belief" and "interpretation" to define the scope of sleeping and sleeping area in his testimony.

{¶ 52} Indeed, appellee appeared to change his criteria for what constitutes a "sleeping area" throughout his attempts to enforce the fire code against appellant. Appellee's January 2024 inspection reports specifically identified appellant's provision of cots as creating a sleeping area. Appellant then removed the cots from the building, but

---

[8] A "sleeping room" is "[a] room that provides at a minimum adequate sleeping accommodations for each guest such as a bed, bunk, cot or other furniture designed for sleeping and accompanying bedding, mattress, box spring, pillow(s), sheets and pillow cases." Admin. Code 1301:7-7-02. A "sleeping unit" is "[a] room or space in which people sleep, which can also include permanent provisions for living, eating, and either sanitation or kitchen facilities but not both. Such rooms and spaces that are also part of a dwelling unit are not sleeping units." *Id*. A "dwelling unit" is a "[a] single unit providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking and sanitation." *Id*.

29.

in a subsequent inspection, appellee found a sleeping area existed despite the cots'
removal and issued another notice of violation. During his deposition testimony in the
federal litigation, appellee explained that a sleeping area is not limited to the use of cots
but instead one is created by "essentially using bedding materials, cots, pillows, or
arranging furniture to create bedding areas." In that same deposition, appellee
maintained that under his personal understanding, he did not believe that the presence of
individuals sleeping on the premises alone creates a sleeping area, but he struggled to
articulate a clear delineation between different scenarios in which sleeping may occur.
For example, appellee testified that a person sleeping while on the floor leaning against a
wall or while sitting in a chair resting their head on a table, even if the person uses a
pillow, would not create a sleeping area, but a person sleeping in a recliner chair could
possibly create a sleeping area if the person did not "simply" fall asleep but was using the
chair for bedding. Later, at the preliminary injunction hearing in this litigation, appellee
again expanded his definition of a sleeping area, testifying that permitting an individual
to sleep on the floor without any bedding or furniture whatsoever creates a sleeping area,
and the absence of bedding, pillows, or furniture "did not change [his] understanding of
the requirement for sleeping."

{¶ 53} Further demonstrative of the lack of objective criteria is appellee's
testimony that that he could not categorize appellant's use occupancy into a specific
residential group. The fire code divides residential uses into four groups, R-1, R-2, R-3,
and R-4, but appellee testified that he could not determine in which of those groups to

classify appellant's use. Appellee testified that appellant would need to hire a professional engineer for assistance in determining the appropriate residential use group. Notably, an automatic sprinkler system is not required for all residential use groups, so some residential groups involve lesser hazards than others, and thus identifying a specific residential group is important to determine the level of hazard a use presents. Indeed, appellee testified at a deposition just weeks before the trial court's preliminary injunction hearing that it was possible appellant would not need to install an automatic sprinkler system if appellant's use fell into the R-2 group. However, at the hearing, appellee testified that he conducted additional research after his deposition, and based on that research, appellant's mixed assembly-residential use meant that appellant would still need to install a sprinkler system even if appellant's residential use was in the R-2 group. Appellee's inability to categorize appellant's use into a residential group and appellee's changing conclusions—which continued to shift up until the date of the hearing—about the necessity of an automatic sprinkler system and therefore the hazard created by appellant's use demonstrate that appellee lacked the professional judgment to interpret the fire code's use occupancies and assess the hazards, the fire code contains insufficient objective criteria to do so, or both.

{¶ 54} The lack of objective criteria in the fire code to categorize appellant's use as residential combined with appellee's shifting interpretations throughout the matter's pendency demonstrates that the fire code provisions at issue are not generally applicable. Without sufficient objective criteria to interpret the code, a local fire authority retains

31.

wide discretion to determine when a change of use has occurred or when a new use presents a greater hazard than a previous use, leaving open the possibility for appellee to consider the religious reasons for appellant's conduct.

{¶ 55} Indeed, if any common thread exists in appellee's shifting criteria for what constitutes a sleeping area, it is in examining the intentions of the sleeping individual and appellant in permitting the individuals to sleep. Appellee repeatedly distinguished between a person who "simply" falls asleep from one who intentionally creates a place to sleep, which necessarily requires an inquiry into the particular reasons for the individual's conduct. The fire code supports appellee's distinction in that regard, defining a residential use occupancy as the use of a premises for "sleeping purposes." As to its purposes, appellant maintains that it has no intention of creating a homeless shelter, but instead its intention is to provide an overnight ministry in which individuals can pray, engage in fellowship, and listen to scripture, and it would violate its sincerely held religious beliefs to wake individuals who fall asleep during its ministry. Appellee's conclusion that appellant's use is residential is therefore predicated on detangling appellant's use of the premises for "sleeping purposes" from its religious purposes. Because those two purposes are inexorably intertwined, appellee had to consider the reasons for appellant's conduct—including its religious reasons—when exercising his discretion to determine that appellant impermissibly changed its use occupancy, and therefore the fire code provisions at issue are not generally applicable. *See Fulton*, 593 U.S. at 533–34, quoting *Emp. Div.*, 494 U.S. at 884 ("A law is not generally applicable if

32.

it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'"). Accordingly, appellee's attempted enforcement of the fire code is subject to strict scrutiny under federal constitutional law, and the trial court erred in applying a rational basis review.

### B. The trial court did not apply Ohio constitutional law.

{¶ 56} Next, appellant also contends that the trial court erred in concluding that the enforcement of the fire code was constitutional under Ohio constitutional law. Appellant points out that the Ohio Constitution's Conscience Clause—Ohio's constitutional provision protecting the exercise of religion—does not mirror the U.S. Constitution's Free Exercise Clause and instead provides broader protections than its federal counterpart. Appellant alleges that the trial court failed to recognize this distinction and therefore did not apply the appropriate standard to its arguments under the Ohio Constitution's Conscience Clause.

{¶ 57} Ohio's Conscience Clause, set forth in Article 1, Section 7 of the Ohio Constitution, states,

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. ... Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the general assembly to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction.

33.

Although Ohio courts frequently look to federal constitutional law when interpreting rights under the Ohio Constitution, the Ohio Constitution diverges from the federal Constitution in its protection of religious rights. *Compare Humphrey v. Lane*, 89 Ohio St.3d 62, 68 (2000) (holding that the Ohio Constitution provides broader protections of religious rights than the U.S. Constitution) *with Eastwood Mall, Inc. v. Slanco*, 68 Ohio St.3d 221, 222 (1994) (holding that free-speech protections under the Ohio Constitution are identical to those in the U.S. Constitution's First Amendment). The Ohio Supreme Court explained the distinction as follows:

> The Ohio Constitution allows no law that even *interferes* with the rights of conscience. The federal Constitution concerns itself with laws that *prohibit* the free exercise of religion. By its nature the federal Constitution seems to target laws that specifically address the exercise of religion, *i.e.*, not those laws that tangentially affect religion. Ohio's ban on any interference makes even those tangential effects potentially unconstitutional.

*Humphrey*, 89 Ohio St.3d at 67. Accordingly, "the Ohio Constitution's free exercise protection is broader" than its federal counterpart, and a different test applies under Ohio constitutional law than federal constitutional law. *Id*.

{¶ 58} Under Ohio law, a court must apply strict scrutiny to all free exercise claims, even those involving "religiously neutral, evenly applied government actions" as well as "indirect encroachments upon religious freedom." *Id*. Under this test, "the state enactment must serve a compelling state interest and must be the least restrictive means of furthering that interest." *Id*.

34.

**{¶ 59}** Here, appellant opposed the preliminary injunction under both the federal Constitution's Free Exercise Clause and the Ohio Constitution's Conscience Clause, contending that the enforcement of the fire and housing codes would violate its rights under both to exercise its religion. Under Ohio constitutional law, therefore, the fire and housing codes were subject to strict scrutiny. The trial court did not apply a strict scrutiny test as required by Ohio constitutional law, and therefore the trial court neglected to address appellant's rights under the Ohio Conscience Clause.

### C. This matter must be remanded to the trial court.

**{¶ 60}** An appellate court is "a court of review, not of first view." *McOmber v. Liebrecht*, 2023-Ohio-2019, ¶ 42 (3rd Dist.), quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 (2005), fn. 7. As such, "a reviewing court will not ordinarily address issues that were not tried by the trial court." *Eichenberger v. Woodlands Assisted Living Residence, L.L.C.*, 2013-Ohio-4057, ¶ 30 (10th Dist.), citing *State ex rel. Pitz v. Columbus*, 56 Ohio App.3d 37, 45 (10th Dist.1988). If a trial court has not addressed a relevant issue raised and argued by a party, "the appellate court should reserve judgment until such time as the undecided issues are considered by the trial court and that decision is appealed." *Id.*, citing *Crestmont Cleveland Partnership v. Ohio Dept. of Health*, 139 Ohio App.3d 928, 935 (10th Dist. 2000), citing *Warner v. Uptown–Downtown Bar*, 1996 WL 748181, *5 (6th Dist. Dec. 20, 1996). Because the trial court erred in failing to address appellant's arguments under the Ohio Conscience Clause we must remand the case to the trial court for further proceedings. *See Murtha v. Rossford Exempted Village Schools*, 2024-Ohio-

35.

1798, ¶ 72 (6th Dist.). On remand, the trial court is directed to consider appellant's claim under the Ohio Constitution and to reconsider appellant's free exercise claim under the U.S. Constitution using a strict scrutiny analysis.

{¶ 61} Appellant's assignment of error is well-taken.

### IV. Conclusion

{¶ 62} We find appellant's assignment of error well-taken and we reverse the December 5, 2024 judgment of the Williams County Court of Common Pleas and remand the case for consideration of whether the enforcement of the fire code would violate appellant's rights under the Ohio Conscience Clause and the federal free exercise clause consistent with our findings above.

Judgment reversed and
remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

JUDGE

Christine E. Mayle, J.

JUDGE

Gene A. Zmuda, J.
CONCUR.

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.